Filed 10/11/22  P. v. Barrios-Ixolin CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

<table>
<tr><td>
THE PEOPLE,

     Plaintiff and Respondent,

v.

LUIS ENRIQUE BARRIOS-IXOLIN,

     Defendant and Appellant.
</td><td>
A162895

(San Francisco County
Super. Ct. No. SCN 231577)
</td></tr>
</table>

Defendant Luis Barrios-Ixolin[1] paid Tiara Williamson for sexual intercourse, which took place in a portable restroom (porta potty).  During the encounter, Barrios-Ixolin discharged a revolver he was carrying in his front pocket, firing one shot that killed Williamson.  A jury acquitted him of murder but found him guilty of involuntary manslaughter, carrying a loaded firearm, and carrying a concealed firearm.  It also found true that he personally used a firearm during the homicide.  The trial court sentenced him to 12 years in prison, including the upper term of 10 years for the firearm enhancement.

On appeal, Barrios-Ixolin claims that the jury instruction on accident, former CALCRIM No. 510, was legally incorrect.  He also claims that the

---

[1] When Barrios-Ixolin testified at trial, he spelled his last name as "Barrios-Ixcolin."  Because the parties and the balance of the record spell the name without the "c," we do so as well.

1

matter must be remanded for resentencing under Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill No. 567), which altered a trial court's discretion to choose the lower, middle, or upper term. We conclude that any error in the accident instruction was harmless. A remand is required, however, for the court to reconsider in light of the new legislation whether to impose the upper term for the firearm enhancement. Therefore, we vacate the sentence and remand for resentencing but otherwise affirm.[2]

I.
## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Background and Williamson's Encounter with Barrios-Ixolin*

In early 2016, Williamson and Jonathan S. met while they were both temporarily employed at a Ghirardelli Square restaurant. They soon began dating and were in a relationship when their jobs ended that March. Although Jonathan S. found another job, Williamson did not, and she told him she had decided to engage in prostitution to make enough money that they could continue seeing each other. Jonathan S. agreed to help Williamson by driving her to the Mission District and waiting for her while she performed sex work.

Throughout April and May 2016, Jonathan S. took Williamson to the Mission District approximately every other night. He would wait nearby in his car, and she would keep in touch with him by text message. Jonathan S. testified that Williamson generally charged $60 to $80 for sexual intercourse and was paid up front.

---

[2] As a result, we need not address Barrios-Ixolin's remaining claims that the trial court abused its discretion by imposing the upper term for the firearm enhancement and that there is an error in the abstract of judgment.

Around midnight on May 30, 2016, Jonathan S. dropped Williamson off in the Mission District and parked his car to wait for her. Williamson was having "a slow night," and a couple hours passed without her finding a client. Jonathan S. texted her to see whether she wanted to leave, but she said she was going to keep trying.

Williamson eventually informed Jonathan S. that she had found a client. Her encounters normally lasted 15 to 30 minutes, and Jonathan S. became worried when he did not hear from her within that timeframe. He texted her to ask whether she was "still on a date," and at 2:48 a.m., she responded that she was. He never heard from her again.

Meanwhile, a witness who lived in a building near the intersection of 18th Street and Alabama Street was watching a movie when he heard a male voice outside say "something along the lines [of], over here, over there." The witness looked out the window and saw a man with "a bit of a pot belly" who appeared to be "Latin."

Sometime later, the witness heard "the sound of [a] porta potty being maneuvered," which from prior experience he knew "causes a large sort of echoey sound." At the time, the witness's building was being painted, and two porta potties for the workers were stationed next to each other in a parking space in front of the building. Earlier that day, the witness had seen "some young kids" break into one of them by breaking the lock on the door.

After hearing the porta potty shaking, the witness heard a woman's muffled voice saying something like, "No, no." He had the impression that the voice was coming from inside the porta potty. The witness agreed that "the porta potty [then] really started to violently shake," as if "there was some sort of struggle going on inside." The witness heard a single gunshot, the shaking stopped, and a woman screamed and called out the name "John."

3

Other witnesses who lived in the same building also testified that they heard a sound like a gunshot and then a woman's scream.

One of those witnesses then looked outside and "saw what [he] believed was a woman walking diagonally, more like a half run in a sort of limp, going diagonally across the street." She moved into a dark area and he lost sight of her. The original witness did not see the woman, but he did see the same potbellied man "backing out from between the two porta potties that were positioned side-by-side." The man, whose shirt was untucked, got into a car parked nearby, and the car drove away toward 19th Street.

Another witness who lived in a different building on Alabama Street testified that he was awakened by "a scream." Immediately afterward, at 2:54 a.m., he called 911. During the call, the witness told the dispatcher that "[i]t sounded like [a woman] screamed 'rape,' " and he mentioned hearing "a loud sound" he did not think was a gunshot. In his testimony, however, he said he heard the woman say a word "more like 'help,' " not "rape," and he described the sound following the scream as "two gunshots" that were "unmistakably gunfire." Similarly, this witness's wife, who was also awakened by the noise, heard a woman scream "help" and then "[t]wo loud bangs."

*B.      The Evidence at the Scene and Williamson's Autopsy*

Two San Francisco police officers were dispatched to the intersection of 18th Street and Alabama Street, where they arrived three minutes after the 911 call was made. Bystanders directed the officers toward Williamson, who was lying on the ground on 18th Street west of the intersection. She was not breathing, and she later died at the hospital. Three $20 bills and two unused condoms were found in her possession.

4

The porta potty with the broken lock was on the street, "right next to the curbline," and the other porta potty was "directly in front of it, into the street." The small amount of space between the two did not allow the broken porta potty's door to open "fully," although it could open "enough [for a person] to gain access." The broken porta potty's exterior length and width dimensions were three feet, seven inches by three feet, eight inches, and its interior was "cramped" even for one person.

The broken porta potty contained "a $1 bill, an open condom wrapper" of the same brand as the condoms found on Williamson's body, a used condom, and an "elastic strap" from Williamson's bra. There were no bullet holes in the porta potty, and no evidence was found in its tank when the tank was drained. The parties stipulated that Williamson's DNA was on one side of the used condom and Barrios-Ixolin's DNA was on both sides of it.

Williamson, who was five feet, seven inches tall and weighed 195 pounds when she died, had three gunshot wounds: one above her left elbow, one near her left shoulder, and one on the left side of her upper back. The wound near her elbow was discolored in a way that suggested it was an entrance wound and the gun was in close proximity to her when fired. The wound in her back, which also appeared to be an entrance wound, could have been "a re-entry wound," and the bullet that caused it was found lodged in her neck. The bullet had traveled through her left lung and carotid artery, causing significant internal bleeding that ultimately killed her.

It was undisputed that Williamson's wounds were caused by one bullet. The pathologist who performed the autopsy testified that there were "many possible scenarios" under which a single bullet caused Williamson's injuries, including that her arm was positioned behind her body when she was shot. In particular, the pathologist agreed that Williamson could have been leaving

5

"very close quarters" with her "left arm up . . . when the gun fire[d]." She had gunshot residue on both hands, consistent with being close by when a gun was fired.

### C.    Barrios-Ixolin's Version of Events

Barrios-Ixolin, who was 28 years old when he killed Williamson, was arrested a few months after the homicide. He testified that on the night in question, he was at his job as a security guard until 1:00 a.m. After he finished work, his cousin picked him up in the cousin's car and they drove to the Mission. They planned to hire a sex worker and take turns having sex with her.

According to Barrios-Ixolin, after he and his cousin arrived in the Mission, they picked up Williamson, who agreed to have sexual intercourse with them for $60 each. Williamson said she "had a place [they] could go to have sex," and they drove to Alabama Street and parked near two porta potties. Barrios-Ixolin gave Williamson $60, and they exited the car while his cousin stayed in the driver's seat to wait his turn.

Barrios-Ixolin, who was about five feet, eleven inches tall and weighed 300 pounds, testified that he entered the porta potty with the broken lock first and Williamson followed him inside. Because the two porta potties were so close together, it was necessary to turn sideways to go in and out of the broken porta potty. Williamson was standing in front of him with her back to him. She handed him a condom, and he pulled down his pants to put it on. She then leaned forward, and the two began having sexual intercourse.

Barrios-Ixolin was carrying an unregistered gun in his front right pants pocket. He claimed that he obtained the gun about two weeks before the homicide because of a disturbing phone call he had received. During the call, which was from a Mexico number, a man said Barrios-Ixolin's name and

6

threatened to kill him in a week. Barrios-Ixolin, who came to this country from Guatemala when he was 19 years old, was "scared" because he was worried about "the same violence" that had caused him to leave Guatemala. After the call, he bought a small Smith & Wesson .38 caliber revolver "on the street" and routinely kept it in his pocket.[3]

As Barrios-Ixolin and Williamson were having sex, he "felt that she was pulling on [his] pants" by his pocket. He looked down and saw that she had her right hand on the gun and was "trying to pull it." He "grab[bed] her hand" and "tr[ied] to take the gun from her" as she turned to exit the porta potty. He grasped the gun by the handle and "took it from her completely," at which point "a shot went off."[4]

Barrios-Ixolin testified that when the gun fired, "a bit more than half [of Williamson's] body was already outside" the porta potty, and Williamson was turned "sideways" with her left side facing him. He claimed that he did not realize the bullet hit her, because he did not see any blood and she quickly exited the porta potty and ran away toward 18th Street. "[S]cared by the sound of the gun," Barrios-Ixolin also left the porta potty and got into his cousin's car. They drove away toward 19th Street, and Barrios-Ixolin did not see Williamson again. He testified that he did not know she had died until after he was arrested for the homicide.

Worried the police would come because of the gunshot, Barrios-Ixolin decided to dispose of the gun. He and his cousin got on Highway 101, and he

---

[3] A criminalist testified that the bullet recovered from Williamson's body could have been fired by a "Smith and Wesson .38 Special" revolver.

[4] Barrios-Ixolin originally testified that he grabbed the gun "by the barrel," but on redirect he clarified that he meant "the handle." According to a defense expert, it was possible that the revolver Barrios-Ixolin described, which would not have a safety, could have been accidentally cocked during the struggle.

7

threw the gun out of the car onto the side of the freeway.[5] Barrios-Ixolin later attempted to lead the police to the gun, but it was never recovered.

### D. Procedural History

Barrios-Ixolin was charged with felony counts of murder, carrying an unregistered loaded firearm in public, and carrying a concealed unregistered firearm.[6] It was also alleged that during the murder he personally and intentionally discharged a firearm and personally used a firearm.[7] The jury found him not guilty of first degree murder and not guilty of the lesser included offenses of second degree murder and voluntary manslaughter.[8] It found him guilty of the lesser included offense of involuntary manslaughter and found true that he personally used a firearm during the offense.[9]

---

[5] The parties stipulated that the cousin later pleaded guilty to a felony charge of accessory after the fact under Penal Code section 32. All further statutory references are to the Penal Code.

[6] The charges were brought under sections 187, subdivision (a) (murder), 25850, subdivision (a) (carrying loaded firearm), and 25400, subdivision (a)(2) (carrying concealed firearm). Counts of assault with a firearm, being a felon in possession of a loaded firearm, being a felon in possession of a concealed firearm, and destroying evidence were dismissed before the case was submitted to the jury.

[7] The firearm allegations were made under sections 12022.53, subdivision (d) (personal and intentional discharge), and 12022.5, subdivision (a) (personal use).

[8] The prosecution sought a first degree murder conviction on the theory that Barrios-Ixolin killed Williamson during a rape or attempted rape. As part of its case, the prosecution presented testimony from a friend of Barrios-Ixolin's cousin that Barrios-Ixolin said he had fantasies about being "rough" with sex workers. We do not discuss this aspect of the case, as the jury rejected any theory that Barrios-Ixolin intended to rape or kill Williamson.

[9] The conviction for involuntary manslaughter was under section 192, subdivision (b). There was no finding on the allegation of personal and intentional discharge of a firearm under section 12022.53, subdivision (d),

In June 2021, the trial court denied probation and sentenced Barrios-Ixolin to a total term of 12 years in prison, composed of the lower term of two years for involuntary manslaughter and a consecutive upper term of 10 years for the firearm enhancement. The court imposed concurrent 16-month terms for the gun-possession offenses and stayed the term for carrying a concealed firearm.

II.

DISCUSSION

A.      *Any Error in the Jury Instruction on Accident Was Harmless.*

Barrios-Ixolin claims that his homicide conviction must be reversed because the version of CALCRIM No. 510 given incorrectly stated the requirements for a homicide to be accidental. We conclude that any error was harmless.

Barrios-Ixolin filed a motion in limine for the jury to be instructed "on accident as a theory for an excusable homicide" under former CALCRIM No. 510. The trial court agreed to instruct the jury on accident, and Barrios-Ixolin then asked that the form instruction be modified to state that acquittal is required if the killing was due to an accident *or* a lawfully committed act, not that both are required. He also requested that the following language be added: "If the prosecution fails to prove beyond a reasonable doubt that a killing was both (1) not a result of accident and misfortune and (2) . . . committed with criminal[] negligen[ce], the defendant is not guilty of murder and manslaughter and he is entitled to an acquittal." (Italics omitted.) The court declined to modify the instruction, and the jury was instructed under former CALCRIM No. 510.

since that provision does not apply to involuntary manslaughter. (See § 12022.53, subd. (a).)

9

We review de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088; *People v. Moore* (2011) 51 Cal.4th 1104, 1140.)

Section 26, the general statute addressing accident, provides that "[p]ersons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence," are not capable of committing crimes. Section 195, which addresses accident in the context of homicide crimes, states that a homicide is excusable "[w]hen committed by accident and misfortune, *or* in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent." (Italics added.)

At the time the jury was instructed, former CALCRIM No. 510 provided that a defendant was not guilty of homicide if the defendant "killed someone as a result of accident or misfortune" *and* "1. The defendant was doing a lawful act in a lawful way; [¶] 2. The defendant was acting with usual and ordinary caution; [¶] AND [¶] 3. The defendant was acting without any unlawful intent." The form instruction was later revised so that it now reads: "The defendant is not guilty of [homicide] if [the defendant] killed someone: [¶] 1. By accident and misfortune; [¶] *OR* [¶] 1. If the defendant was doing a lawful act in a lawful way; [¶] 2. The defendant was acting with usual and ordinary caution; [¶] AND [¶] 3. The defendant was acting without

10

an unlawful intent to commit [a homicide]." (CALCRIM No. 510, italics added.)

Barrios-Ixolin contends that his requested modification was necessary to make clear that he "was entitled to acquittal[,] even though [his] possession of the firearm was unlawful," if the jury found that "the firearm accidentally discharged." He argues that contrary to section 195, former CALCRIM No. 510 "improperly require[d] a finding that the killing occurred during a lawful activity" *and* that it was accidental, a mistake the current version of the instruction has corrected. He claims that under the instruction given, the jury could not acquit him even if it accepted the accident theory, since he concededly possessed the gun illegally.

We are not convinced that former CALCRIM No. 510 was inconsistent with section 195. That statute says that homicide is excusable "[w]hen committed by accident . . . or in doing any *other* lawful act" with reasonable caution and lawful intent (italics added), implying that an accident itself must be a lawful act. Ultimately, we need not decide whether the challenged instruction incorrectly stated the law, however, because any error was harmless. As Barrios-Ixolin concedes, the error was not prejudicial if the jury necessarily resolved the disputed factual issue against him under other, proper instructions. (See *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 46; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165.) As we now explain, this standard was met here.

In general, "the claim that a homicide was committed through misfortune or by accident 'amounts to a claim that the defendant acted without forming the mental state necessary to make [the defendant's] actions a crime.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 674; see *People v. Anderson* (2011) 51 Cal.4th 989, 996–997.) The jury was instructed under

11

CALCRIM No. 580, an instruction Barrios-Ixolin does not challenge, that to find him guilty of involuntary manslaughter, it had to conclude that he acted with criminal negligence in committing the crime of carrying a loaded firearm or carrying a concealed firearm and that his acts caused Williamson's death. Thus, his claim that the killing was accidental was another way of urging that the prosecution had not proven beyond a reasonable doubt that he acted with criminal negligence.

By convicting Barrios-Ixolin of involuntary manslaughter, the jury necessarily found that he *did* act with criminal negligence in possessing the gun and, further, that this act caused Williamson's death. In particular, the jury was instructed that "[a]n act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act." Thus, although Barrios-Ixolin claims that his "mere possession of the firearm . . . did not cause the gun to fire," the jury concluded that Williamson's death was a natural and probable consequence of his criminally negligent act. In doing so, the jury effectively rejected Barrios-Ixolin's position that he acted without a culpable mind state.

The true finding on the firearm enhancement also establishes that any error in the accident instruction was harmless. The jury was instructed under CALCRIM No. 3146, an instruction that Barrios-Ixolin does not challenge either, that he personally used a firearm during the homicide if he "intentionally [did] any of the following: [¶] 1. Display[ed] the weapon in a menacing manner; [¶] 2. Hit[] someone with the weapon; [¶] OR [¶] 3. Fire[d] the weapon." The jury was also instructed under CALCRIM No. 3404 that he was not liable for the firearm enhancement "if he acted without the intent required . . . but acted instead accidentally." There was no evidence that Barrios-Ixolin displayed the gun or hit someone with it.

12

Therefore, we agree with the Attorney General that "the jury presumably found that [Barrios-Ixolin] intentionally fired the firearm," necessarily meaning it concluded the homicide was not accidental.

In short, even if the jury was incorrectly instructed on accident, it made other findings foreclosing the conclusion that Williamson's death was accidental. Accordingly, reversal is not required.

### B. *Remand Is Required for the Trial Court to Resentence Barrios-Ixolin Under Senate Bill No. 567.*

Barrios-Ixolin also claims that pursuant to Senate Bill No. 567, a remand is required for the trial court to reconsider whether to sentence him to the upper term for the firearm enhancement. We agree, and we therefore vacate the sentence and remand for resentencing in light of the new legislation.

Barrios-Ixolin was sentenced to the upper term of 10 years for the firearm enhancement under section 12022.5, subdivision (a). At the time of sentencing, former section 1170.1, subdivision (d), provided: "If an enhancement is punishable by one of three terms, the [trial] court shall, in its discretion, impose the term that best serves the interest of justice, and state the reasons for its sentence choice on the record at the time of sentencing." Here, the trial court said that it selected the upper term "primarily" because (1) the firearm "was used to shoot someone," not "to smack someone with, or scare someone or menace them"; and (2) Williamson was "particularly vulnerable," based on "where she was, how she was positioned." The court also cited the fact that "[t]he crime . . . involve[d] great violence."[10]

---

[10] The parties suggest that the trial court also relied on, as the Attorney General puts it, Barrios-Ixolin's "decision to carry a loaded firearm without a safety into not only a high crime area, but into the confined space of the porta potty." The court said it would consider its belief that Barrios-Ixolin did not

13

Effective January 1, 2022, Senate Bill No. 567 amended section 1170.1 to provide that "[i]f an enhancement is punishable by one of three terms, the [trial] court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (§ 1170.1 subd. (d)(1); Stats. 2021, ch. 731, § 2.) In turn, subdivision (d)(2) of the statute provides that "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial." (§ 1170.1, subd. (d)(2).) Thus, the middle term is now the presumptive sentence for an enhancement unless aggravating circumstances admitted or proved beyond a reasonable doubt justify the upper term.

As the parties agree, Senate Bill No. 567 is ameliorative legislation that applies retroactively to judgments, like Barrios-Ixolin's, that were not final at the time it took effect. (*In re Estrada* (1965) 63 Cal.2d 740, 745; *People v. Jones* (2022) 79 Cal.App.5th 37, 44; *People v. Lopez* (2022) 78 Cal.App.5th 459, 465 (*Lopez*).) The parties also agree that the aggravating circumstances on which the trial court relied were not admitted or found true beyond a reasonable doubt. But they disagree about whether a remand is required for the court to reconsider whether to impose the upper term, as

---

have a good reason to have the gun in deciding "what the proper sentence is in terms of the gun use and underlying crimes," but it did not clearly cite this circumstance when imposing the upper term on the firearm enhancement. Regardless, we conclude that the court could not properly rely on this factor because there is a reasonable probability the jury would not have found it true beyond a reasonable doubt, an aspect of the standard for assessing prejudice that we address in more detail below.

Barrios-Ixolin claims, or whether a remand is unnecessary because "any alleged error was harmless," as the Attorney General claims.

The Courts of Appeal are currently split on the applicable standard for assessing prejudice in this situation, and the issue is pending before our state Supreme Court. (*People v. Lynch* (May 27, 2022, C094174 [nonpub. opn.], review granted Aug. 10, 2022, S274942.)  The primary disagreement is between *People v. Flores* (2022) 75 Cal.App.5th 495 (*Flores*), a decision by Division Three of this court, and *Lopez*, a decision by Division One of the Fourth District Court of Appeal.  *Flores* concluded that a remand for resentencing is unnecessary if the reviewing court can determine beyond a reasonable doubt that the jury would have found true at least one aggravating factor (*Flores*, at p. 501), and *Lopez* concluded that a remand is necessary unless the reviewing court can determine beyond a reasonable doubt that (1) the jury would have found true all the aggravating factors the trial court cited or (2) the trial court would have reached the same decision even if it knew it could not properly rely on all the factors it did (*Lopez, supra*, 78 Cal.App.5th at p. 467, fn. 11).

Division Two of this court has agreed with *Lopez* (*People v. Wandrey* (2022) 80 Cal.App.5th 962, 982, review granted on another ground Sept. 28, 2022, S275942), and Division Six of the Second District Court of Appeal has agreed with *Flores* (*People v. Salazar* (2022) 80 Cal.App.5th 453, 465).  The Third District Court of Appeal and Fifth District Court of Appeal have articulated yet other standards.  The Third District essentially agreed with *Lopez*, stating that "[its] approach and the *Lopez* court's approach are the same in terms of outcomes," but described the standard differently.  (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1113.)  The Fifth District concluded that since the type of error at issue has both federal Constitutional and state law

15

dimensions, "the correct standard for harmless error lies between the standards articulated in *Flores* and *Lopez*," a standard we discuss in more detail below. (*People v. Dunn* (2022) 81 Cal.App.5th 394, 408–409 (*Dunn*).)

We agree with the majority of courts to address the issue that, contrary to *Flores*, "a reviewing court finding beyond a reasonable doubt that the jury would have found a single aggravating factor true beyond a reasonable doubt is insufficient to conclude that the error was harmless." (*Dunn, supra*, 81 Cal.App.5th at p. 408.) We need not decide which of the remaining potential standards for assessing prejudice is correct, however, because even applying the *Dunn* standard—the most favorable to the People other than the *Flores* standard—a remand is required.

*Dunn* described the standard for assessing prejudice as follows: "The reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is [no] reasonable probability that the jury would [not] have found any remaining aggravating circumstance(s) true beyond a reasonable doubt.[11] If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was harmless. If not, the reviewing court moves to the second step of *Lopez*, (2) whether there is a reasonable probability that the trial court

___

[11] In the original, *Dunn* describes the "(1)(b)" part of the standard as "whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt," but later describes it as whether there is "a reasonable likelihood the jury would not have found the . . . aggravating circumstance true beyond a reasonable doubt." (*Dunn, supra*, 81 Cal.App.5th at pp. 410–411.) The latter formulation is correct, as the question under *Watson* is whether there is a reasonable probability of a result more favorable to the defendant, not whether there is a reasonable probability that the same, unfavorable result would be reached again. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps. If the answer is no, the error was harmless. If the answer is yes, the reviewing court vacates the sentence and remands for resentencing." (*Dunn, supra*, 81 Cal.App.5th at pp. 409–410, footnotes omitted.)

Applying this standard here, we conclude that a remand is required. We have no reasonable doubt that the jury would have found true that Barrios-Ixolin's gun "was used to shoot someone" and the gun use "involve[d] great violence," in that Williamson died. But we think there is a reasonable probability that the jury would not have found true that Williamson was "particularly vulnerable." Although she was physically positioned in a way that contributed to her death, the jury accepted Barrios-Ixolin's claim that he did not intentionally shoot her, meaning he did not take advantage of her position to commit the crime. In addition, Williamson was not "elderly, very young, or disabled, or otherwise obviously and indisputably vulnerable" in a more general sense. (*People v. Sandoval* (2007) 41 Cal.4th 825, 842 [reasonable doubt existed as to whether jury would have found vulnerability factor true].)

Since we cannot conclude with sufficient certainty that one of the aggravating factors on which the trial court relied, Williamson's vulnerability, would have been found true if submitted to the jury, we proceed to the second step of the prejudice analysis. (See *Dunn, supra*, 81 Cal.App.5th at p. 410.) The court's belief that Williamson was particularly vulnerable was one of the two main factors on which it relied to impose the upper term, and under the current version of section 1170.1 the middle term is the presumptive term. Given these circumstances, we believe "there is a reasonable probability that the . . . court would have imposed a sentence

17

other than the upper term" had it realized it could not rely on Williamson's purported vulnerability. (*Dunn*, at p. 410.) Accordingly, a remand is required for the court to resentence Barrios-Ixolin under the current version of section 1170.1.

## III.
### DISPOSITION

The sentence is vacated, and the matter is remanded for resentencing in light of Senate Bill No. 567. The judgment is otherwise affirmed.

_____

Humes, P.J.


WE CONCUR:



_____

Banke, J.




_____

Devine, J. *




     *Judge of the Superior Court of the County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*People v. Barrios-Ixolin*  A162895